GILLETTE'S ESTATE et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 12,379.

United States Court of Appeals
Ninth Circuit.

June 14, 1950.

Edward H. McDermott, Wm. M. Emery and John S. Pennell, all of Chicago, Ill., for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Melva M. Graney and Harry Marselli, Sp. Assts. to the Atty. Gen., for respondent.

Before MATHEWS, STEPHENS and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

We are here petitioned to review a Tax Court redetermination of the federal estate tax liability of the Estate of Edwin F. Gillette, deceased.

The Commissioner of Internal Revenue determined that certain inter vivos transfers by decedent of interests in real property had been made in contemplation of death. See Section 811(c) of the Internal Revenue Code, 26 U.S.C.A. § 811(c).[1] The value of such interests was not returned in the estate tax return filed, and the Commissioner notified decedent's personal representative that a deficiency existed. The Tax Court was petitioned to redetermine the contemplation of death issue.

Upon stipulated facts and oral evidence put on solely by petitioner, the Tax Court ruled that petitioner had failed to show that the inter vivos transfers had not been made in contemplation of death, and thereupon a decision was entered that there was a deficiency in estate tax in the amount determined by the Commissioner.

It is not disputed but that the values placed by the Commissioner on the property interests involved are correct.

At the date of the property transfers in controversy in 1938, decedent, a widower, was 75 years of age and concededly in excellent health. His nearest relatives included four grown children and a sister. Decedent and his sister, among other property holdings, each owned through inheritance from their father undivided half interests in three pieces of real estate, which for sake of brevity will be referred to herein as the "Hartford Building", the "Michigan Avenue property" and the "Lake Beulah property." The Hartford Building and the Michigan Avenue property were business properties situated in Chicago. The Lake Beulah property located in Wisconsin consisted of a summer home frequented by family members and their individual families.

The substantial part of decedent's income came from the above mentioned business properties. Although a graduate engineer, decedent for many years had devoted himself exclusively to non-business activities and various hobbies (from languages and designing to expert handicraft and photography) and at no time showed any inter-

1. That part of I.R.C. § 811 which is pertinent here reads as follows:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

\*   \*   \*   \*   \*   \*

"(c) Transfers in contemplation of \* \* \* death. To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of \* \* death \* \* \*."

est in the management by his sister's husband of such business properties.

Some months prior to the date of the subject transfers, through a French study group in which he was interested, decedent met and became enamored of a lady, a French teacher, who was 34 years his junior. She, although favorably inclined, was reluctant to accept his proposal of marriage for fear of being considered an "interloper" in decedent's well-knit family. Decedent unbeknown to her wrote each member of his family of his intentions to marry and quite eloquently and intimately supplied details as to his prospective wife, her background and her interests, suggesting that "Perhaps a reassuring letter from each might bring a solution" and professing that "I feel, in my inmost heart, that I cannot be truly happy again, alone."

The opposition of decedent's sister and her husband was immediate and determined. Their objections stemmed from knowledge of decedent's financial condition, his failure for many years to satisfy a sizable indebtedness to his sister on promissory notes or to pay the interest thereon, and his failure to contribute his half of the upkeep expense in maintaining the Lake Beulah property. Such opposition was sharpened by the possible impairment of title to the Michigan Avenue property. This property was subject at the time to a lease with option to purchase wherein the lessors had convenanted to convey a good title to the lessees if and when such option was exercised (as it later was) for the faithful performance of which the lessees had deposited a sizable sum with the lessors. Decedent's children voiced no objections to the proposed union and, if not all, all but one expressly approved of it.

Decedent's son, Hyde, together with a son-in-law who was an attorney, undertook to bring about a unanimity of the family in the matter. The husband of decedent's sister was adamant in his objections to the marriage and even uttered a threat to sue decedent on the promissory notes above mentioned. Hyde and the son-in-law worked out a plan and proposed it to decedent. It was testified by Hyde that his father's re-

action to the plan after its explanation was "that if Howard [the son-in-law] and I thought it was all right and *it met the problems that had arisen,* for us to go ahead and draw up the instruments" [Emphasis ours].

Such plan as was thereafter accomplished included a prenuptial agreement and the following conveyances (we emphasize only the salient features of each): As to decedent's interest in the Hartford Building, an irrevocable trust in favor of his four children as life beneficiaries and remaindermen was created, with Hyde as trustee. It was provided that the conveyance in trust was in consideration of the trustee's assumption of and agreement to pay, out of trust assets only, decedent's indebtedness (capital and interest) to his sister which was the basis of the disagreement.

Decedent's interest in the Michigan Avenue property was conveyed to his son Hyde in trust ultimately for the benefit of decedent's four offspring. Trust income was to be paid to decedent's four offspring. Trust income was to be paid to decedent for his life except that his sister was to receive during her life $1000 per year (approximately one-half of the annual interest due on decedent's indebtedness to her) or such part thereof as was necessary to pay her $1000 a year whenever the trust covering the Hartford Building did not pay her that much interest on such indebtedness (this never happened). Provisions were made for a life estate of $1500 per year in favor of decedent's widow if he should marry and predecease the wife. Decedent retained the right to terminate, alter or modify this trust in any respect at any time.

The Lake Beulah interest was conveyed outright by warranty deed to decedent's children.

In a pre-nuptial agreement executed by decedent and his prospective wife shortly after the above conveyancing occurred, the properties belonging to decedent, including those just conveyed, and the fact of such transfers were recited, and decedent's prospective wife in consideration of marriage and the payment of $1500 per year to her for life after decedent's death

waived any dower, homestead or other statutory rights in decedent's properties whenever acquired.

The marriage took place and some seven months after the above related transfers, decedent, without the knowledge of his wife or any other member of his family, executed a will wherein he left all his properties to his wife.

At the age of 81 years (over 5 years after the date of the subject transfers) decedent died unexpectedly after a short illness.

It is the value of decedent's interest in the Hartford Building and the Lake Beulah property which the Commissioner determined should have been included in decedent's gross estate at death. The value of the Michigan Avenue interest was included in the estate tax return and the propriety thereof is not before us.

Petitioner contends (1) that the uncontradicted evidence clearly discloses that the inter vivos transfers in question were not made in contemplation of death and (2) that the Tax Court erroneously treated as evidence the general presumption of correctness which attaches to the commissioner's determination.

Since the former "Tax Board" is now the "Tax Court," although it always has been and is continued "as an independent agency in the Executive Branch of the Government" see 26 U.S.C.A. § 1100, and since the "review" of Tax Court "decisions" by the United States Courts of Appeals is taken and treated "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury" see 26 U.S.C.A. § 1141(a), it would seem desirable for the Tax Court to voluntarily conform to Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A., wherein it is provided that in non-jury cases district courts "shall find the facts specially and state separately its conclusions of law * * *."

Had such been the practice in the instant case (and it was not) we would have been able more readily and more certainly to ascertain the findings of fact upon which the decision is based.

■■ Under the district court practice, there most probably would be no issue in the case as to whether the trial court herein erroneously failed to follow the rule laid down in Hemphill Schools, Inc. v. Commissioner, 9 Cir., 1943, 137 F.2d 961,[2] to the effect that the presumption of correctness of the Internal Revenue Commissioner's determination does not constitute evidence in the case. There are some expressions in the "Memorandum Findings of Fact and Opinion" which also includes conclusions of law which seems to indicate that the court arrived at its decision through the process of off-setting evidence in the case by the presumption of correctness rather than merely applying the burden of proof rule. However, after observing the court's hearing member's analysis of the several crucial events in the case, we are left with little or no doubt but that the court applied the correct rule. Compare quotation in the margin.[3]

■ It is to be noticed that the Tax Court's statement of the evidence in its "Memorandum" incorporates the material evidence adduced by petitioner and that the respondent introduced no evidence. The error complained of is asserted to exist in the inferences or conclusions drawn by the Tax Court therefrom. In such circumstances it has been said in cases appealed from dis-

---

2. See also J. M. Perry & Co., Inc., v. Commissioner, 9 Cir., 1941, 120 F.2d 123; San Joaquin Brick Co. v. Commissioner, 9 Cir., 1942, 130 F.2d 220.

3. "Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid. * * Frequently, if not quite generally, evidence adequate to overthrow the Commissioner's finding is also sufficient to show the correct amount, if any, that is due. * * * But, where as in this case, the taxpayer's evidence shows the Commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax that confessedly he does not owe, unless his evidence was sufficient also to establish the correct amount that lawfully might be charged against him." Helvering v. Taylor, 1935, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623.

trict courts that within certain limits we are free, that is, that we have the power (and we would suppose the duty) to draw such inferences or conclusions as we deem proper. See Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 1941, 119 F.2d 704; Western Union Telegraph Co. v. Bromberg, 9 Cir., 1944, 143 F.2d 288; Home Indemnity Co. of N. Y. v. Standard Accident Insurance Co., 9 Cir., 1948, 167 F.2d 919; Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 1949, 178 F.2d 541. Compare Equitable Life Assurance Society v. Irelan, 9 Cir., 1941, 123 F.2d 462. And since I.R.C. § 1141(a) has been amended to provide that reviews from Tax Courts shall be in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury, what we have just said is germane here. See Wright-Bernet, Inc., v. Commissioner, 6 Cir., 1949, 172 F.2d 343. Rule 52(a) of the Rules of Civil Procedure provides that findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. However, as will be seen from a reading of the following passage from the oft-referred to case of United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746, the clearly erroneous doctrine of Rule 52(a) is a limitation on Courts of Appeals and precludes such courts from entirely disregarding the trial tribunal's conclusions and trying the case wholly de novo upon the evidence adduced: "In so far as (the findings to be considered) * * * are inferences drawn from documents or undisputed facts * · * * Rule 52(a) of the Rules of Civil Procedure is applicable. That rule prescribes that findings of fact in actions tried without a jury 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' It was intended, in all actions tried upon the facts without a jury, to make applicable the then prevailing equity practice. Since judicial review of findings of trial courts does not have the statutory or constitutional limitations on judicial review of findings by administrative agencies or by a jury, this Court may reverse findings of fact by a trial court where 'clearly erroneous.' The practice in equity prior to the present Rules of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court. The findings were never conclusive, however. A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

We have carefully considered the effect on this case of subsection (c) (1) of I.R.C. § 1141 after the above-mentioned amendment to subsection (a) of such section. Does the limitation of power on review to "modify or to reverse" the Tax Court only when its decision is "not in accordance with law" contained in (c) (1) remain effective in the face of the provision in the amended (a) in which the review provided is to be "in the same manner and to the same extent as [review of] decisions of the district courts in civil actions tried without a jury." ? We think it clear, if there is a conflict, which we doubt, that the appellate power must be construed in conformance with the later enacted (a). In the way we view the evidence in the instant case, as will more clearly be shown hereinafter, the decision is "not in accordance with law" because we think every part of the substantial evidence properly related to the whole of the evidence points unmistakably to the conclusion that it is wrong. Since we are reviewing the case in the same manner and to the same extent as a decision of the district court, and we are applying all of the elements and limitations mentioned in the Gypsum case, we are of the opinion that clearly a mistake has been made and therefore the decision is "clearly erroneous."

■ It is commonly stated, and properly so, that due respect should be given to the Tax Court's expertness in tax matters. While in most circumstances such respect would weigh heavily, we are not impressed

by it here where the ultimate inference of fact must be as to what the decedent contemplated as the driving reason for his actions regarding his property. In this duty, which does not bring technical tax questions into play, it is in no way derogatory to the Tax Court to say that United States Courts of Appeals are as well equipped to draw inferences as is the Tax Court and for that reason the Tax Court decision calls for little more weight than its logic suggests.

■ No issue is made here that the transfers of the Hartford and Lake Beulah properties were made causa mortis in view of decedent's age and health. That is, decedent at the time did not suffer an apprehension of imminent death. The meaning of "In contemplation of death" as used in Internal Revenue Code § 811(c) is, however, not so restricted. See United States v. Wells, 1931, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867. Nor does the phrase mean "that general expectation of death such as all persons entertain." See Treasury Regulations 105, Section 81.16. The Supreme Court in Allen v. Trust Company of Georgia, 1946, 326 U.S. 630, 635, 66 S.Ct. 389, 391, 90 L.Ed. 367, restates the governing principle, set forth in several of its decisions, as follows: "Since the purpose of the contemplation of death provision was to reach substitutes for testamentary dispositions in order to prevent evasions of the tax * * *, the statute is satisfied * * * where for any reason the decedent becomes concerned about what will happen to his property at his death and as a result takes action to control or in some manner affect its devolution. * * * The transfer is made in contemplation of death if the thought of death is the 'impelling cause of the transfer.' * * * On the other hand, every man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts plainly are not made in contemplation of death in the statutory sense. Many gifts, even to those who are the natural and appropriate objects of the donor's bounty, are motivated by 'purposes associated with life, rather than with the distribution of property in anticipation of death.'"

Petitioner's evidence portrays decedent as an individual of artistic temperament and social inclinations who for most of his life at least was wholly satisfied to devote himself to pleasurable hobbies and activities and to go along on inherited income and who was totally uninterested in any enhancement of such income through his own efforts in the business world. His lack of business acumen was early demonstrated, whenceforth his first wife, and a daughter after the former's death, handled decedent's finances. What income producing properties were owned by decedent and his sister were managed by others in the family group.

The family group as a whole was well to do, and they got along well together. It was not until decedent announced his intention of remarrying that dissension arose. Family finances keynoted the discord. The ingress of a new personality into the group could well unbalance it through such person's extravagance or unwillingness to conform in property matters. And, it is common experience that such newcomer, albeit welcome, initially becomes the cause of later discontent.

The "crux of the matter" [quoting the Tax Court], namely, what did decedent contemplate at the date of the subject transfers, had to be determined from what decedent did and the surrounding circumstances. What he did in fact was to dispose of a substantial part of his property holdings by conveyances to or in favor of his children. Of course, the result of what he did is no certain criterion of his intention nor indeed is it any criterion thereof that the realization of the "life" motive for his action may not have necessitated disposal of his properties.

■ It is argued for petitioner that the nature of decedent's individuality dispels any inference from what he did that he was in effect insuring a certain devolution of the substance of his estate in contemplation of death. The Tax Court's inference to the contrary derives from the faulty reasoning that, because ultimately devolution after death of some or all of the property transferred will be affected, the transaction is in

contemplation of death. It gives no weight, it would seem, to the conclusive and uncontradicted evidence that the whole activity regarding decedent's property was for the purpose of securing to the actor in this case the great prize he coveted, a companiable wife. That several months after making the transfers and after marriage he executed a will leaving his remaining properties to his wife is some evidence that he recognized the effect of the conveyances he had made. A like effect springs from every gift. Concededly the status quo was disturbed solely because of decedent's desire to marry and it can not reasonably be deduced from the evidence that any action would have been taken by him regarding his properties but for such desire. There is nothing on the face of what was done to tie his acts to a contemplation of death. We suppose that men are presumed to intend what their acts purport to do and we learned many years ago that a presumption is *subsidium justitiae*.

To sustain the Tax Court's order it must be held that the property arrangement had as its impelling motive the orderly manner in which decedent desired his property to descend at his death. But to do so would be to disregard what to us is the necessary and inescapable inference from all of the facts that decedent had "life" rather than "death" in his mind, that he was not concerned with the business aspect of property, that but one combination of circumstances stood in the way of conjugal paradise into which he so fervently desired to enter, and that he was more than willing that his property should be so shifted as to remove the cause of that one objection, to-wit: The indebtedness to his sister. While he was doing this it was perfectly reasonable that he should think of caring for his children by gifts out of his love for them and that they would enjoy their early possession and relieve him of responsibilities that a father has with his children and of scotching any jealousy that might find seed in his devotion to and his expenditures upon his new wife. We are persuaded from a careful study of the whole case that the Tax Court's decision is drawn from inferences which fail to take the realities of life

into proper consideration and is a mistake arising out of a fine line of conjecture that decedent's intent was more and different than that which is so plainly shown by the whole story.

The Tax Court argues a lack of financial necessity attending the Hartford transfer. It is true that decedent's indebtedness to his sister amounted only to some $45,000 and the value of his interest in the Hartford Building as determined by the Commissioner amounted to approximately $121,000, but it is equally true that such property was at the time subject to an $85,000 mortgage, a fact not mentioned by the Tax Court in its analysis.

The Tax Court stressed the relative financial unimportance of the provisions in the Michigan Avenue trust whereby a certain portion of the current interest due to decedent's sister on the above-mentioned indebtedness which decedent owed to her was guaranteed in the event income of the Hartford trust was not sufficient to pay such portion or part of it. The Hartford Building had produced little income since 1933 when the lease thereof was forfeited by lessees. It was thus apparent that although the property value of the Hartford Building was sufficient to secure the debt principal, payment of accruing interest was doubtful. Making part of the income of the Michigan Avenue property available for the latter purpose served in part to appease decedent's sister and her husband, even though the trust itself was revocable or alterable by decedent.

As to the transfer of the Lake Beulah property, it appears to us as falling nicely into the general plan of adjustment to accommodate decedent's marriage. Not only was he relieved of financial obligations in the upkeep of such property but those who with decedent's sister and her husband more often used such summer facilities were made responsible therefor. Moreover, there was less likelihood of initial or eventual dissention if the new wife came to Lake Beulah, if at all, as a guest. She testified that she told decedent's son, Hyde, in answer to Hyde's suggestions at a meeting with him prior to the transfers and her

marriage to decedent that "I would prefer to have it that way rather than to continue the upkeep, continue to have joint ownership and have two families run one establishment." These sound reasons may or may not have been expressed to decedent but they could well intrude themselves by the force of their own fundamental soundness.

The Michigan Avenue transfer, with which we are not here concerned except as it bears upon decedent's intent in the circumstances of the whole affair, accords nicely with the only expressed intent of decedent. By it he affected in no way the income to which he had been accustomed. A daughter of decedent's testified that "[a]s long as the checks kept coming in he never worried about where they came from or what was behind it." When such income was threatened with diminution later through extraordinary income taxes resulting from the sale of the Michigan Avenue property and because of the improbability of any safe investment of the proceeds of such sale that would yield the amount of income to which decedent was used, he amended the trust to insure receipt of such amount of money even if and to the extent it had to be paid from trust principal.

It is our firm conviction that the property arrangement was dominantly in contemplation of decedent's remarriage, not in contemplation of death. Hyde testified that his purpose as told to his father "was to permit him [decedent] to continue a happy life in the way he wished and at the moment that involved making it possible for him to get married with the friendly feelings of all the family." We think this also was decedent's dominant purpose in all his acts affecting his properties. All other purposes and results were incidental to and in aid of such controlling purpose.

We find that decedent's dominant purpose in transferring his properties as he did was to clear away objections to his marriage and that he did not make such transfers in contemplation of death.[4]

Reversed.

4. The case of In re Kroger's Estate, 6 Cir., 145 F.2d 901, decided December 4, 1944, has some resemblance to the instant one but with several significant differences.

In the first place the decision antedated the amendment to I.R.C. § 1141(a) which changed the power and duty of the reviewing Court of Appeals from the limitation defined in the so-called "Dobson rule" to that of an appeal from a district court. We do not minimize the salient rule that decisions of a specialty agency should be given weight.

The factual differences in the two cases are quite significant. The motive for Kroger's transfer of property in trust while it was in view of an elderly widower's intended marriage to a younger woman had nothing to do with clearing away objections to the union for there were none. It was reasonable that Kroger was thinking only of the effect after his death that such marriage might have on the disposition of his property for although the trust he created was made irrevocable he retained for life the income therefrom. In our case the main effect of all of Gillette's acts toward his property was to gain an inter vivos objective, and the donees of the gifts in question had immediate possession and enjoyment.

Viewing all of the facts as a whole in the Kroger case most certainly leaves one with the clear impression that it was a settlement in contemplation of death while just the opposite impression is left us after a consideration of all the facts as a whole in the Gillette case.

A case closer to our case is that of Lippincott v. Commissioner, 3 Cir., 1934, 72 F.2d 788, 790, decided prior to the above-mentioned amendment to I.R.C. § 1141(a) and prior to the Dobson case. The reviewing court reversed the then Board of Tax Appeals' finding that the transfers were made in contemplation of death and held that "the evidence [which was undisputed] requires the determination that the decedent was motivated by a purpose associated with life rather than death." And, this decision was in the face of the rule then existent that the Tax Board must be sustained if there is substantial evidence to support its findings whereas the case at bar must be decided by us practically under the equity rule where the case is brought to the reviewing court on undisputed evidence from which inferences must be drawn.