**R. P. FARNSWORTH & CO., Inc. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 14160.**

United States Court of Appeals
Fifth Circuit.

April 10, 1953.

R. Emmett Kerrigan, Marian Mayer, New Orleans, La., Deutsch, Kerrigan & Stiles, Ralph L. Kaskell, Jr., New Orleans, La., of counsel, for petitioner.

Maryhelen Wigle, Harry Baum, Sp. Assts. to Atty. Gen., Charles S. Lyon, Asst. Atty. Gen., Ellis N. Slack, Acting Asst. Atty. Gen., Charles W. Davis, Chief Counsel, Rollin H. Transue, Sp. Atty., Bureau of Internal Revenue, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

HOLMES, Circuit Judge.

The question presented is whether salaries paid by petitioner to its seven executive officers, plus contributions made by it to a pension trust fund for the benefit of the same officers, were deductible as reasonable compensation for services rendered the corporation by each of them during the years 1944 and 1945, as contemplated by Section 23(a) (1) (A) and (p) (1) (D) of the Internal Revenue Code, 26 U.S.C.A. § 23 (a) (1) (A), (p) (1) (D).

The facts as stipulated and as found by the court may be stated briefly as follows: Petitioner is the largest concern engaged in the general contracting and construction business in the State of Louisiana. Founded in 1887 by R. P. Farnsworth, it was conducted as a partnership until its incorporation in 1935, and has been continuously developed by members of the Farnsworth family. Its common stock was owned entirely by its seven executive officers who, with one exception, constituted its board of directors. These executives, during the taxable years, were a well-coordinated team engaged in the active conduct of the business of the petitioner, and were responsible for its growth and success. Although they had assistants, the

latter were men in subordinate positions, with less capacity and ability.

These executives devoted their entire time to the business of the corporation, and participated actively in fixing prices, bidding for contracts, and in the performance of contracts that were completed during the taxable years. They secured the business, managed it, assumed the responsibility for the performance of the contracts, and handled the execution thereof to completion. In doing so, they gained for petitioner the reputation of being a low-bidder, capable of a large volume of work, and the only contractor in the area equipped to perform practically all of its construction without having to sub-contract major divisions of the work.

In 1942, the taxpayer executed a pension trust agreement for the benefit of a number of its employees, including its executive officers. In 1945 the executives, as directors, reduced their salaries in order to improve the company's cash position for business expansion, and transition to a peacetime economy. The salaries were predicated on the value of services that each man contributed, measured by his skill and experience and the size of contracts assigned to each. There is no question here of tax evasion, as the court found that petitioner's board of directors did not at any time consider the possibility of distribution of dividends under the guise of salaries. The salaries were determined at the beginning of each year, and the decision as to the declaration of dividends was not made until the end of the year. Dividends were declared by the taxpayer on its common stock in each year from 1936 to 1949, inclusive, with the exception of the years 1941 and 1945.

The Commissioner determined that the salaries paid by petitioner from 1942 through 1945 were excessive, and disallowed the deduction for contributions to the pension trust fund. Before the Tax Court, in order to show the reasonableness of the compensation, the taxpayer introduced in evidence 53 exhibits and the testimony of 13 witnesses. It sought to establish, for the taxable years, the extent and scope of the activities of its seven executive officers, the scarcity of capable construction executives, general economic conditions affecting salaries, salaries paid by it and comparable enterprises in previous years, comparison between salaries and business done, and the absence of any motive for tax evasion. The Commissioner offered no rebuttal evidence. The Tax Court found that the compensation paid in 1942 and 1943 was reasonable and deductible; but it affirmed the Commissioner's determination of what constituted reasonable compensation for 1944 and 1945.

In finding that the salaries for the latter two years were excessive, the court stressed the fact that the taxpayer's gross receipts from completed contracts and total operating profits decreased substantially during those years, compared with previous years. It found that petitioner had failed satisfactorily to discharge its burden of introducing evidence to overcome the *prima facie* correctness of the Commissioner's determination. As a result of the decrease in profits, the court concluded that the value of their services also decreased during the two years, because of the absence of evidence showing that they had performed other services in lieu thereof, which entitled them to receive compensation equal to that earned in 1943.

Although the dollar volume of contracts actually awarded to petitioner during 1944 and 1945 was considerably less than in the two preceding years, which was generally attributed to reduction in the federal construction program for 1943, the evidence does not show that the activities of the executives were reduced to an extent justifying the salary reductions called for by the Commissioner. In 1944 and 1945, petitioner prepared and submitted bids on 261 and 301 contracts, respectively, as compared to 71 and 98 submitted in the two previous years. The contracts that it was awarded in 1944 and 1945 numbered 78 and 56, respectively, whereas it performed only 23 and 35 in the two earlier years. It is of no consequence here that the contracts for the 1942–43 construction were for large individual projects, providing greater profits for the company, rather than smaller and more isolated jobs. The company's

earned surplus in each of the years 1944 and 1945 was twice as much as it was in 1942, the surplus for 1944 exceeding that of the preceding year.

Facing an expected general decline in business after the government's withdrawal from the construction scene, the petitioner's directors elected, against these odds, to expand its operations. In 1944, it sent some of its construction experts (including two of its executives) to Houston, Texas, to establish a branch office. Among other things, this expansion into new territory necessitated the development by the New Orleans office of a complete new bookkeeping and accounting system for the Houston office, and the establishment of a connection between the two offices in other respects. During this period, the executives were required to make numerous trips to and from Houston for conferences. This venture into another state to compete with established firms apparently proved to be a success, the Houston office having realized a gross profit of $25,650 in 1944, and over two-hundred thousand dollars in 1945.

Three witnesses familiar with the construction field, one of whom was a past president of the Associated General Contractors of America, were of the opinion that the salaries were reasonable; it was the opinion of one of the witnesses that the salaries in some instances were relatively lower than those customarily paid to such executives. In 1949 two of petitioner's executives, D. N. Chambers and Richard Farnsworth, believing that their compensation was inadequate, resigned, purchased the Houston branch office, and established their own construction business.

■ While the findings of the Tax Court should not be set aside unless clearly erroneous, this court has jurisdiction to review its decisions in the same manner and to the same extent as those of the district court in civil actions tried without a jury. 26 U.S.C.A. § 1141(a). See Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. Since the Commissioner offered no evidence, the petitioner was denied the opportunity of examining the correctness of his computations; and was left to stand upon its own proof, none of which was refuted. Therefore, we think, the burden of presenting evidence to rebut any presumption in favor of the Commissioner's findings was fully met, and the Tax Court clearly erred in finding that the salaries were unreasonable.

■ These men were capable, industrious, enterprising, and highly successful in their field. During the war years they directed petitioner's business with great success, at the same time performing valuable construction work for the government. Following the peak and decline of the prosperity occasioned by war construction, they chose a more dynamic program of expansion, which was typical of the ingenuity that is characteristic of American business. It would be unjust for the taxing power of the government to force a reduction in their salaries because of the temporary recession in profits. This was a matter within the discretion of the corporate board of directors. Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171; Heywood Boot & Shoe Co. v. Commissioner, 1 Cir., 76 F.2d 586, 588; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131 F.2d 712; Express Publishing Co. v. Commissioner, 5 Cir., 143 F.2d 386, 388; Wright-Bernet, Inc., v. Commissioner, 6 Cir., 172 F.2d 343; Roth Office Equipment Co. v. Gallagher, 6 Cir., 172 F.2d 452; Mayson Mfg. Co. v. Commissioner, 6 Cir., 178 F.2d 115, 119; Gillette's Estate v. Commissioner, 9 Cir., 182 F.2d 1010, 1013; J. H. Robinson Truck Lines, Inc., v. Commissioner, 5 Cir., 183 F.2d 739.

We find that the compensation paid to each of petitioner's executives during 1944 and 1945 was reasonable and deductible. That part of the judgment appealed from is reversed, and the cause remanded to the Tax Court with directions to modify its decision in conformity with this opinion.

RIVES, Circuit Judge (dissenting).

This case presents the familiar question of the reasonableness of amounts deducted by a corporation as compensation for the services of its officers. When the case reached the Tax Court, there was no presumption that the compensation agreed upon by the corporation and its officers was

reasonable in amount. Rather, the Commissioner's determination was presumptively correct, and the taxpayer's evidence must be sufficient to rebut it. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Gem Jewelry Co. v. C. I. R., 5 Cir., 165 F.2d 991. When the case reaches this Court, the Tax Court's finding of the amount constituting reasonable compensation is entitled to finality unless it is clearly erroneous. Burford-Toothaker Tractor Co. v. C. I. R., 5 Cir., 192 F.2d 633, 635; and authorities there cited.

The seven executives to whom the compensation here in question was paid constituted the sole common stockholders of taxpayer, all but one comprised its board of directors, and five of them were its officers. In 1941 they received salaries totaling $165,400.00. In each of the years 1942, 1943 and 1944, their salaries were increased to a total of $246,000.00, plus about $13,000.00 of annuity contract premiums paid in their behalf in each of the years 1943 and 1944. In 1945 taxpayer sustained a net loss and the salaries were decreased to a total of $194,499.00. The Commissioner allowed a deduction of a total of $185,000.00 for 1944 and $170,000.00 for 1945, or slightly more than was paid and allowed for 1941. The issue here reduces itself to whether the Tax Court's findings as to the years 1944 and 1945 are clearly erroneous. The tax court concluded from all the evidence that the taxpayer had failed to meet the burden of proving that amounts greater than those allowed by the Commissioner were reasonable and accordingly sustained the Commissioner's determination as to those years.

The volume of taxpayer's construction work declined substantially in 1944 and further declined in 1945.[1] In 1942 and 1943 only two general superintendents were employed. Despite the decline in construction work after 1943, taxpayer in 1944 employed nine and in 1945 it employed fourteen additional general superintendents and there was evidence from which the Tax Court could conclude that they performed some of the services theretofore performed by the seven chief executives. The opening of a Houston office in 1944 did not greatly increase the overall services of the executives. Two of them were assigned to manage that office and thereafter participated less in the activities of the New Orleans office. The number of bids made in 1944 and 1945 increased but the total contract price awarded on all bids made in those years was about one-third of that awarded in 1942 and 1943.[2]

The foregoing illustrates only a few of the relevant factors to be considered in determining the reasonableness of claimed salary deductions. The Tax Court, as is plain from its opinion, based its findings on the "voluminous and detailed evidence and the opinions of the witnesses", and a "thorough analysis of all of the evidence". It properly reached its conclusion on the basis of the entire record.

It is not surprising to me that the Commissioner offered no evidence. The underlying facts were not in dispute and were amply proved by the voluminous testimony. It is only the inferences drawn from those facts and the opinions of the witnesses that might call for rebuttal evidence on the part of the Commissioner. The case of Burford-Toothaker Tractor Co. v. C. I. R., supra, and many others have illustrated the ease with which the taxpayer can obtain opinion evidence to sustain the reasonableness of salaries paid, and the difficulty with which the Commissioner can obtain countervailing opinions. Indeed, common sense informs us that any business competitor supplying such evidence against a taxpayer would incur his undying enmity.

1. Gross receipts from completed contracts were 41.50 per cent less in 1944 than 1943 and 35.96 per cent less in 1945 than in 1944. Gross operating profit was 50.01 per cent less in 1944 than in 1943, and 59.31 per cent less in 1945 than in 1944.

2. The total price of contracts awarded amounted to $5,456,227 in 1944, and $5,516,914 in 1945, as compared with over $16,000,000 in each of the years 1942 and 1943. The bids made by the Houston office in 1944 and 1945 were for comparatively small contracts, which accounts for the increase in the total number of bids in those years.

494

Tax gatherers, when they perform their function, always have been and always will be unpopular figures, and cannot expect members of the public to rally to their support. Matthew, himself the tax collector of Capernaum, who became an apostle, showed how his fellow "publicans" were regarded when he classed them with sinners, harlots, and heathens (Matthew 9:11; 11:19; 18:17; 21:31). Yet taxes are the life blood of our nation. The Tax Court must often sustain the unpopular Commissioner, and, when the findings of the Tax Court are not clearly erroneous, the appellate courts should not substitute their judgments for those of the Tax Court. It is only by a strict observance of that principle that any reasonable degree of uniformity can be maintained in the administration of our tax laws. I, therefore, respectfully dissent.