Griswold Rubber Company, Inc. v. Commissioner.
Griswold Rubber Co. v. Commissioner
Docket No. 318-63.
United States Tax Court
T.C. Memo 1965-33; 1965 Tax Ct. Memo LEXIS 297; 24 T.C.M. (CCH) 184; T.C.M. (RIA) 65033; February 18, 1965
Robert E. Jacobson, Charles E. Clapp II, and Ernest N. Agresti, Edwards & Angell, 15 Westminster St., Providence, R.I., for the petitioners. Albert R. Doyle, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: [1] Respondent determined deficiencies in petitioner's income tax for the fiscal years ended May 31, 1959 and May 31, 1960, in the amounts $37,497.25 and $28,639.52. Certain issues raised by the notice of deficiency and the pleadings have been conceded by the parties and will be given effect in the Rule 50 computation. The only issue for decision is whether the compensation paid by petitioner to its five principal officers during *298 the taxable years 1959 and 1960 was reasonable in amount so as to be deductible under section 162(a)(1) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts were stipulated by the parties and are hereby found accordingly. Griswold Rubber Company, Inc. (hereafter called petitioner) is a corporation organized and existing under the laws of the State of Connecticut. Its principal place of business is located in the Town of Plainfield, Village of Moosup, Connecticut. Petitioner was incorporated in April of 1949. It is engaged in the business of manufacturing sponge rubber products. Petitioner keeps its books and records on the basis of a fiscal year ending May 31 and uses the accrual method of accounting. It filed its Federal income tax returns for the fiscal years *299 ended May 31, 1959, and May 31, 1960, with the district director of internal revenue for the district of Connecticut. Petitioner began its operations in 1949 with the manufacture of windlace. Windlace is a sponge rubber strip covered with fabric which is attached to the door frames of automobiles. It serves as a dust and wind seal. Petitioner purchases crude rubber from the Far East and Africa as the basic raw material for its manufacturing operations. When the rubber is received, it is first tested in order to determine characteristics such as plasticity, cleanness, and color. Once they have been determined, the rubber is masticated in a large mixture. Heat is applied and a plasticizer added to break the rubber down into a pliable material. Sodium bicarbonate and other chemicals are then added. When combined with steric acid, sodium bicarbonate gives off CO2 which blows the rubber into sponge. After the rubber has been mixed in the proper proportions, it is placed into calendars and extruders and shaped into the desired forms. As heat is applied, the sponge rubber expands into the desired thickness. This expansion process is one of the differences between the manufacture of solid *300 rubber and sponge rubber, adding to the difficulty of its manufacture. When unblown sponge rubber is placed into a mold, it is necessary to allow for the exact amount of expansion to give the proper size and shape to the end product. There have been a number of rubber companies in the windlace business, including some much larger than petitioner. However, petitioner has survived this competition and prospered. At the present time there are only two other suppliers of windlace to the automotive industry, B.F. Goodrich & Co. and U.S. Rubber Co. Both are complex, diversified firms, much larger than petitioner. One of the reasons for petitioner's success was the development of a new manufacturing process for making windlace. It achieves closer tolerances, avoids variations and permits greater flexibility in shape. Petitioner manufactures windlace with flanges and die cuts that will fit easily and properly on automobiles in the assembly line process. Petitioner has an excellent record of meeting the quality and tolerance requirements set by the automotive industry. It has also been unique in maintaining flexible manufacturing operations and scheduling, thus permitting it to give special *301 service on rush orders. The results of these services can be measured by petitioner's constantly increasing gross sales and expanding percentage of the windlace market. When petitioner started its business it operated primarily as a converter for fabric manufacturers. These manufacturers sent narrow webbing to petitioner to be filled with vulcanized sponge rubber. The windlace was either shipped back to the fabric manufacturer or on directly to the automotive customer for the account of the fabric manufacturer. This method of operation continued until 1959, at which time petitioner began acting as the primary contractor and supplier of windlace to the automotive manufacturers. With the exception of some very small quantities of sheet sponge rubber, windlace was the only product manufactured by the petitioner for approximately the first ten years of its existence. In 1959 it went into the sheet sponge rubber business seriously, selling principally to shoe manufacturers. Petitioner began operations in a 10,000 square foot plant in Voluntown, Connecticut. Three years later, because more space was needed and additional working capital was required, petitioner sold this plant and *302 leased a 50,000 square foot plant in Jewett City, Connecticut. In 1957 petitioner purchased its present plant in Moosup, Connecticut, which has approximately 100,000 square feet. Petitioner was owned by the following individuals in 1959 and 1960: Shares
Paid-in
Percent
Stockholder
owned
capital
of total
Wayne D. Bradley
110
$11,000
22
George L. Guimond
110
11,000
22
Lawrence V. Sarni
70
7,000
14
Paul F. Bradley
70
7,000
14
Izaias G. Sardo
70
7,000
14
Louis G. Stahl [2]
70
7,000
14
500
$50,000
100
Petitioner was formed by Wayne D. Bradley (Bradley) and George L. Guimond (Guimond). They were joined by Bradley's brother, Paul F. Bradley (Paul), Lawrence V. Sarni (Sarni), Izaias G. Sardo (Sardo), and Louis G. Stahl (Stahl) to form the original management group. Bradley graduated from M.I.T. in 1915 where he majored in chemistry. He was employed as a chemist until 1921 including a period of *303 employment with the U.S. Rubber Company. In 1921 he left that firm to join a family business for about 10 years. He later returned to the U.S. Rubber Company as a sales engineer, and finally became sales manager in charge of the sponge rubber division. Bradley's duties for U.S. Rubber included laboratory work in the development of products as well as sales work. He was particularly concerned with sponge rubber products, including the manufacture of sponge rubber for windlace. Bradley left U.S. Rubber in 1949 in order to establish the petitioner. Bradley has been chairman of the board of directors, president, and general manager of the petitioner from its inception. He is responsible for its overall operation. He is charged with the coordination of the various stages of production. He is special arbitrator on problems arising between the sales and manufacturing departments. He was responsible for purchase of crude rubber for the petitioner until some time during the fiscal year ended May 31, 1959. This purchasing is done on a futures basis. Considerable skill and judgment are required in order to maintain adequate supplies of quality crude rubber at advantageous prices, and to schedule *304 deliveries to meet manufacturing schedules. Bradley maintains contact with petitioner's major customers. He is particularly concerned with products development, which includes the creation of new products as well as the improvement in quality of old ones. Guimond is the vice president of petitioner. He attended business college and night schools where he studied architectural and mechanical drawing, public speaking, and shorthand. He was employed by various automobile manufacturers and railroads from 1912 until 1924 when he first became a manufacturer's representative to the automotive industry in or about Detroit. In his early years as a manufacturer's representative he sold upholstery fabrics and trim materials to the three major automobile companies. He commenced selling windlace about 1934 when he represented Bridgeport Fabrics Company. He continued to represent them in the Detroit area in the sale of windlace until 1959. Throughout this period he worked from an office in Detroit. From 1949 on, Guimond's activities were motivated by a desire to represent Bridgeport Fabrics and the petitioner, who was then making the rubber for windlace and assembling the finished product for *305 Bridgport Fabrics. He worked with the automobile manufacturers in the engineering of automobile bodies insofar as windlace was concerned. In this capacity he represented Bridgeport Fabrics as the manufacturer of the fabric in windlace and the petitioner as manufacturer of the sponge rubber in the windlace. He constantly checked to see that all shipments were in order and that the windlace met the required specifications. He was the contact man for all complaints and problems which arose with the petitioner's products. From 1959 on, Guimond continued operating substantially as he had in the past, substituting the petitioner for Bridgeport Fabrics as the primary supplier of windlace. Sarni is secretary and plant manager of petitioner. He graduated from the University of Rhode Island with a degree in chemical engineering. He has taken management courses with the University of Rhode Island Extension in Providence, Rhode Island. After his discharge from the United States Army, Sarni was employed by the U.S. Rubber Company at Naugatuck, Connecticut. He worked as a control chemist in the fuel cells department, which made self-sealing gasoline tanks for military aircraft. Later he became *306 the control chemist for sponge rubber. In that capacity he was responsible for maintaining production schedules, correcting problems on the production lines and scheduling trials. Sarni was finally placed in charge of compound and product development of sponge rubber. His responsibility on this job included developing new compounds and formulations in order to produce letter sponge rubber products. He also investigated new chemicals to find if they could be substituted for those in short supply. He worked with customers' inquiries and requests for new products. In the course of this employment it was necessary for Sarni to be in touch with the industrial engineering department of U.S. Rubber regarding the methods and equipment to be used in manufacturing new products. He worked jointly with the cost department of the firm to establish costs and prices for new products. He set up running standards and controls for the manufacture of sponge rubber. Finally, he served as liaison man between the development, manufacturing, and sales departments to investigate customers' complaints and to work out solutions to problems which arose in the field. Sarni took an active part in the formation *307 and organization of petitioner. He worked with Sardo and Bradley in laying out the new plant and setting up the manufacturing operation. He personally contacted various chemical companies and obtained sources of supply. He set up training schedules for new personnel. He and Sardo worked together closely in the training of personnel. Sarni also served as chemist for the petitioner and in that capacity developed compounds and formulations for the products to be manufactured, developing time and temperature standards as well as manufacturing procedures. He assumed responsibility for the purchase of crude rubber in 1959. When the petitioner ceased operating as a converter for fabric manufacturers and started selling directly to the automotive industry, Sarni began purchasing the necessary fabrics. He serves as traffic manager and in that capacity is responsible for setting up shipping schedules and routings. He has maintained contact with customers of petitioner in order to deal with any complaints or technical difficulties, and has participated in the determination of costs and prices. Sarni prepares agenda for corporate meetings, notifies the directors, and keeps the minutes. He is *308 responsible for maintaining the petitioner's official records. He has also been responsible for employee fringe benefits, wage scales, and employee safety. He is petitioner's representative in its meetings with attorneys concerning corporate legal matters. Since the death of Paul, Sarni has served as treasurer of the corporation. Paul was a graduate of Bentley College in Boston and was employed throughout his life in jobs involving accounting work and the financial affairs of corporations. In his capacity as treasurer of the petitioner, he established the accounting and control systems which have been used by it. He was the office manager, and as such was responsible for office personnel. He was in charge of purchasing all items for petitioner except crude rubber and machinery. He obtained credit for the petitioner from its suppliers. Because of his handling of corporate financial affairs, he was able to establish a favorable credit rating in the first years of operation. He directed all borrowing transactions from financial institutions to finance operations and growth. He served as credit manager and participated in the determination of costs of petitioner's products. Sardo is *309 the assistant treasurer and assistant plant manager of petitioner. After emigrating to this country in 1920 he went to work for the U.S. Rubber Company where he was employed until 1949, when he left to join the petitioner. Sardo began at U.S. Rubber as a helper and through the years became an experienced operator of all the various equipment and rubber fabrication machines at the plant. He also was responsible for training personnel to operate these machines, and he made adjustments of chemical formulae in order to keep up the proper quality of production. After joining the petitioner, Sardo assumed responsibility for training operators and other rubber production workers. He ran the machines in petitioner's plant when necessary. He supervised the setting up of machinery and was responsible for maintaining proper production schedules. During the years in issue these five officers composed petitioner's board of directors. Their compensation for this duty was $100 per meeting, or approximately $300 per year. The total compensation paid by petitioner to its five officer-stockholders in 1959 and 1960, and the amounts disallowed by respondent as unreasonable, are as follows: Director's
fees and
Bonus
Officer
Year
salary
January
May
Wayne D. Bradley
1959
$30,659
$14,920
$23,872
1960
38,255
8,952
17,904
George L. Guimond
1959
16,863
8,690
13,904
1960
21,003
5,214
10,428
Lawrence V. Sarni
1959
21,003
9,530
15,248
1960
26,175
5,718
11,436
Paul F. Bradley
1959
20,903
9,530
15,248
1960
26,175
5,718
11,436
Izalas G. Sardo
1959
14,097
7,330
11,728
1960
17,546
4,398
8,796
*310 Total
Amount
Percent
Officer
claimed
disallowed
disallowed
Wayne D. Bradley
$69,451
$14,666
21.11
65,111
5,111
7.84
George L. Guimond
39,457 *
14,457
39.45
36,645 *
11,645
31.77
Lawrence V. Sarni
45,781
9,051
19.77
43,329
3,329
7.68
Paul F. Bradley
45,681
9,101
19.87
43,329
3,329
7.68
Izalas G. Sardo
33,155
7,353
22.17
30,740
740
2.40
The bonuses shown in the above schedule were voted by petitioner's board of directors. The financial operations of petitioner were presented to the directors by the treasurer at these meetings. In determining the bonuses, the directors considered the growth and earnings of petitioner and the specific contributions of each officer to that growth. The petitioner's remaining employees received bonuses of five percent of base pay during the years in issue. A group life insurance plan provided death benefits of $5,000 for petitioner's officers and $1,000 for the remaining employees. A wage continuation plan was in effect during the fiscal years 1959 and 1960. *311 It provided for two years' base salary (not including bonuses) to be paid over a five year period to the widow of any of petitioner's officers. There was no pension plan in effect during such years. The commissions paid to Guimond by petitioner represent 3 1/2 percent of the sales made through the office he maintained in Detroit. The normal commission for manufacturer's representatives selling trim materials to automobile manufacturers is five percent. Petitioner's sales, income and dividends records are as follows: Sales
Automotive
Direct
Sheet
Net
Converter
Sales
Sponge
Total
Income
Dividends
1950
$ 228,974
$ 228,974
$ 2,990
1951
580,236
580,236
24,067
1952
449,979
$ 2,932
452,911
(22,504)
1953
815,091
815,091
43,218
$15,000
1954
768,440
768,440
37,709
5,000
1955
924,892
$ 3,779
1,246
929,917
34,922
5,000
1956
1,057,706
5,958
1,063,664
47,582
10,000
1957
975,462
17,142
992,604
42,615
5,000
1958
868,391
2,273
7,268
877,932
26,483
5,000
1959
1,080,029
311,406
120,802
1,512,237
143,340
10,000
1960
657,431
1,082,553
590,822
2,330,806
97,386
4,300
*312 At the close of the taxable years 1959 and 1960, the petitioner's earned surplus and undivided profits were as follows: Year
Amount
1959
$156,843
1960
207,464
During the years in issue petitioner's officers devoted sufficient time to their corporate duties to justify the compensation paid them. The compensation was reasonable for the services performed. Opinion Section 162(a)(1) of the Internal Revenue Code of 1954 provides that "a reasonable allowance for salaries or other compensation for personal services actually rendered" is deductible as a business expense. Respondent disallowed a portion of the compensation paid by petitioner to its five officer-stockholders because respondent determined that it was unreasonable. Petitioner contends that the payments were reasonable in light of the services performed and fully deductible under the statute. Reasonableness of compensation is a question of fact. Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court, Respondent's determination is prima facie correct. Shield Company, Inc., 2 T.C. 763 (1943). *313 Therefore, petitioner has the burden of proving that it is entitled to a larger deduction than that allowed by the respondent. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). Although prior decisions provide us with tests or criteria to be met, each case must be resolved on its own facts, and the presence or absence of any one factor is not conclusive. However, an absence of evidence on a certain point can bear upon whether the petitioner is considered to have met his burden of proof. Miles-Conley Co., Inc. v. Commissioner, 173 F. 2d 958 (C.A. 4, 1954), affirming 10 T.C. 754 (1948). In this case we have looked first at the qualifications of petitioner's officers and the nature and scope of their duties. Coe Laboratories, Inc., 34 T.C. 549 (1960). Special consideration has been given to the knowledge, experience, and technical skills of these officers in producing sponge rubber products as well as their inventive and managerial abilities. The record shows that petitioner's growth has been due almost exclusively to the efforts of this management group. C. P. Lathrop & Co., Inc., 5 B.T.A. 879 (1926). The *314 financial success it now enjoys rests upon the manufacturing and merchandising advancements developed by them. Soabar Co., 7 T.C. 89 (1946). Next we have considered the amount of time these officers devoted to their duties. We think that Bradley's outside business activities were minimal. They had no bearing upon the successful management of petitioner's affairs. Patterson v. McWane Cast Iron Pipe Co., 331 F. 2d 921 (C.A. 5, 1964). We are not persuaded by respondent's argument that Guimond should be somehow less valuable to petitioner because he rarely visited the plant site. His function as the company's sales representative to the automotive industry certainly benefited petitioner because Guimond was in Detroit rather than in Plainfield, Connecticut. The illness suffered by Paul F. Bradley during the years at issue did not diminish his value to the petitioner, even though he devoted less time to actual business activity at the plant. Patterson v. McWane Cast Iron Pipe Co., supra.Sardo and Sarni devoted their full time to petitioner's business. Finally, we have compared the compensation herein with petitioner's sales, income, profits, *315 invested capital, and dividends. Cf. Mayson Manufacturing Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949). There are, of course, other criteria by which reasonableness of compensation can be measured. But only those which in our opinion are most important to the facts of this case have been mentioned. Suffice it to say, petitioner submitted substantial evidence. An important part of it was the expert testimony of Ralph H. Bavier. The weight to be given such evidence was described in Roth Office Equipment Co. v. Gallagher, 172 F. 2d 452 (C.A. 6, 1949), as follows: * * * The only direct evidence before the Court on the specific question of reasonableness of compensation was the testimony of Harold Hampton and Archie Shearer, both well-qualified, impartial witnesses, with many years of experience. They testified that in their opinion the compensation was reasonable, with Mr. Hampton referring to it as "very reasonable." The credibility of these witnesses was not put in issue. The appellee offered no witness to contradict this testimony or to testify in any way that the compensation was unreasonable to any extent. On this crucial and single issue of *316 fact in this case this unimpeached, uncontradicted testimony from well-qualified, impartial witnesses can not be disregarded by the Court. This Court has several times stated that such testimony should be accepted by the fact-finder in a matter in which the fact-finder has no knowledge or experience upon which he could exercise an independent judgment. We cannot agree with respondent's contention that petitioner has failed to meet its burden of proof. On this record we conclude that the compensation paid by petitioner to its five officer-stockholders was reasonable. To hold the petitioner accountable for a greater showing of substantiation would abuse the meaning and purpose of burden of proof. Cf. R. P. Farnsworth & Co., Inc. v. Commissioner, 203 F. 2d 490 (C.A. 5, 1953). To reflect the conclusion reached on this issue and the agreement of the parties on other issues, Decision will be entered under Rule 50. Footnotes
1. This case was heard by Judge Clarence V. Opper and briefs were duly filed. Judge Opper died on June 19, 1964. This case, not having been disposed of, was reassigned to Judge Howard A. Dawson, Jr.↩, on January 4, 1965, and notice was given to the parties that any request for rehearing or argument might be presented to him within 30 days. No such requests have been received.
2. During the fiscal year ended May 31, 1960, Stahl's stock was purchased by petitioner and held as treasury stock. No other transactions affecting outstanding stock have occurred from the date of incorporation through May 31, 1960.↩
*. Does not include 1959 commissions of $5,454 and 1960 commissions of $32,929 paid as manufacturers representative.↩