Kenneth D. Smith and Lorraine Smith v. Commissioner. Chemold Company, a corporation v. Commissioner.
Smith v. Commissioner
Docket Nos. 94205, 94206.
United States Tax Court
T.C. Memo 1965-169; 1965 Tax Ct. Memo LEXIS 158; 24 T.C.M. (CCH) 899; T.C.M. (RIA) 65169; June 25, 1965
*158 Held: (1) compensation paid to Chemold's two principal stockholder-officers (S and E) was not unreasonable; (2) and (3) acquisition by Chemold of Spazier property and acquisition by S and E of a second trust deed note on the Spazier property were two separate transactions, so that the amount of the note was part of Chemold's depreciable basis in the property and Chemold was entitled to deduct amounts credited to S and E as interest; (4) S did not realize additional income as the result of services performed for the prior owner of the second trust deed note; (5) Initiation fee paid by Chemold for a country club membership was a capital item and not deductible as a dues and subscription expense; and (6) S entitled to amortize an improvement built on leased land over the period of the lease rather than depreciate it over its useful life. J. George Gold for the petitioners. Thomas F. Greaves for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: In these consolidated proceedings, respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Docket No.
Docket No.
94205
94206
Year
Kenneth Smith
Chemold Company
1953
None
$ 51,198.45
1954
$34,596.61
47,187.02
1955
1,377.85
None
1956
112.85
None
1957
834.34
6,151.28
$36,921.65
$104,536.75
Since certain issues involving both corporate and individual petitioners have been either settled, conceded or abandoned, decisions will be entered under Rule 50. The remaining issues are: (1) Whether certain portions of Chemold's claimed *160 deductions for compensation paid to its two principal stockholder-officers in the fiscal years ending August 31, 1953, and August 31, 1954, represented unreasonable compensation; (2) Whether Chemold's basis for depreciation of the Spazier property during the fiscal years ending August 31, 1954 through 1957, was $36,465 as determined by respondent, rather than $125,264.84 as claimed by Chemold; (3) Whether Chemold was entitled to deduct amounts credited to the accounts of its two principal stockholder-officers in the fiscal years ending August 31, 1954 through August 31, 1957, inclusive, as interest on a second trust deed note on the Spazier property; (4) Whether Smith realized additional ordinary income in the amount of $52,000 in the calendar year 1954 as a result of services performed for the prior owner of a second trust deed note on the Spazier property; (5) Whether Chemold was entitled to deduct $1,620 as a dues and subscription expense in the year ending August 31, 1954, on account of an initiation fee paid for a membership in the name of Kenneth D. Smith in the Bel-Air Country Club; and (6) Whether a warehouse constructed by petitioner Smith on leased land in 1956 *161 should have been depreciated over the remaining useful life of the building rather than amortized over the five-year term of the lease. General Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Chemold Company (hereinafter sometimes referred to as Chemold) was incorporated under the laws of the State of California on September 11, 1950. Chemold maintained its books of account on the accrual method of accounting and filed its Federal income tax returns for the fiscal years ending August 31, 1953 through 1957 with the district director of internal revenue, Los Angeles, California. Kenneth D. Smith (hereinafter sometimes referred to as Smith) and Lorraine Smith were husband and wife and resided in Santa Monica, California. They reported their income on the cash receipts basis and filed their joint Federal income tax returns for the calendar years here in issue, 1954 through 1957, with the district director of internal revenue, Los Angeles, California. Lorraine Smith is a party to this action only by reason of having filed joint returns with Smith *162 for the taxable years involved. Issue 1 Findings of Fact The hostilities of the Korean War commenced on or about July 25, 1950. About the time of the commencement of the Korean War, Smith contacted J. A. Eisele (hereinafter referred to as Eisele) with regard to an opportunity to acquire the assets of Western Plastics, Inc., a bankrupt California Corporation that had manufactured plastic aerial delivery containers for the armed forces during World War II. Thereafter Smith, Eisele, H. J. Eisele and Tommie Vaughn acquired the assets of Western Plastics, Inc., and incorporated Chemold for the purpose of operating a plastic manufacturing business. Although Chemold came into active existence on September 11, 1950, none of its stock was issued until August 17, 1952. From September 11, 1950, until August 17, 1952, Chemold was equitably owned by the same individuals and in the same percentages as its 25,000 shares of issued and outstanding stock between August 17, 1952, and January 14, 1953, viz.: Number
Percentage
of
of
Stockholder
Shares
Ownership
Kenneth D. Smith
9,375
37.5
J. A. Eisele
8,594
34.376
H. J. Eisele
5,468
21.872
Tommie Vaughn
1,563
6.252
25,000
100.000
*163 On January 14, 1953, Tommie Vaughn sold his stock back to Chemold. On August 17, 1953, Eisele and H. J. Eisele each sold a portion of their stock back to Chemold and from that date until December 15, 1954, at which time they sold their remaining stock back to Chemold, the ownership of Chemold was as follows: Number
Percentage
of
of
Stockholder
Shares
Ownership
Kenneth D. Smith
9,375
50
J. A. Eisele
5,468
29.163
H. J. Eisele
3,907
20.837
18,750
100.000
From December 15, 1954, to date Smith has been the owner of 100 percent of Chemold's issued and outstanding stock. From the date Chemold was incorporated, Smith was its president, general manager, and a director, and devoted his full time and effort to the management of the corporation. Eisele was Chemold's production manager and chairman of its board of directors from the date Chemold was incorporated until December 15, 1954. Prior to accepting full time employment with Chemold, Smith was a certified public accountant, licensed to practice in the State of California, and also was educated and trained in the field of management engineering. Among other activities, he had purchased a shoe *164 company which was in financial difficulties in 1947, reorganized it into a profitable business, and disposed of it in 1950. Prior to his accepting employment with Chemold, Smith agreed to give up his accounting practice and devote his full time and effort to the management of Chemold. Eisele agreed to devote to Chemold as much of his own time and attention as the business might require and, prior thereto, had had previous experience in the fields of manufacturing, ranching, oil production, the automobile agency business and real estate. He was a man of considerable business talent and had successfully managed and operated many businesses. Before Smith and Eisele decided to acquire Western Plastics, Inc., they agreed that they would each draw a salary of $2,000 a month plus 25 percent each of net profits before the payment of taxes. On October 15, 1950, Chemold's board of directors authorized salaries for Smith and Eisele of $24,000 per year plus "additional compensation [of] 25% of the net profits of the business before * * * taxes" payable only in years in which net profits exceeded $10,000. During the first few years of Chemold's operation Smith and Eisele devoted their *165 full time and attention to its business. Smith had full responsibility for the finances of the business. Eisele had full responsibility for the production operations of the business. The two of them, together with an employee, Francis E. Vonderahe (hereinafter called Vonderahe), who was an engineer, shared the duties and responsibilities relating to the creation and testing of products. Smith and Eisele both put in substantially more than normal working hours; Smith often working a seven-day week and Eisele a six-day week. On September 23, 1952, Chemold's board of directors, in view of contemplated expansion and the increased efforts that would be required, authorized an increase in Smith's and Eisele's salaries from $24,000 a year to $36,000 a year. The board also continued their right to the additional compensation of 25 percent of net profits before payment of taxes. During the fiscal years ending August 31, 1951 through August 31, 1954, Smith had full charge and responsibility for sales, contract negotiation, budgets, office management, and price determination. He was also partially responsible for the preparation of tax returns and maintaining liaison with various government *166 agencies. He did a substantial amount of traveling, participated in test programs, shared the purchasing duties with Eisele and collaborated with Eisele and Vonderahe, Chemold's only engineer, with respect to the design of tools and products. Through December 15, 1954, Eisele assumed full responsibility for setting up the manufacturing machinery and equipment, hiring and supervising personnel, supervising production, overseeing quality control, expediting production and shipping, and handling outside products. During the fiscal years ending August 31, 1951 and 1952, Smith and Eisele each performed the jobs of several executives and each devoted substantially more than normal working hours to the operation of Chemold. Beginning in the fiscal year ending August 31, 1953, Smith and Eisele tired of the long hours and developed some outside interests which took them away from Chemold's business part of the time. During its 1953 and 1954 fiscal years Chemold employed a number of individuals who were to assume certain tasks formerly handled by Smith and Eisele. Thus, Chemold employed a "superintendent" for a salary of $10,250 for its 1953 fiscal year and $12,000 for fiscal 1954; a plastics *167 technician for $9,575 in fiscal 1953 and $8,284 in fiscal 1954; an accountant, for $8,200 in fiscal 1953 and $12,000 in fiscal 1954; a research and development new-products man for $18,000 in fiscal 1954; a sales and advertising man for $9,150 in fiscal 1954; a purchasing and expediting man for $8,050 in fiscal 1954; and a foreman for $6,200 in fiscal 1954. Also, Chemold's income tax returns for fiscal years 1953 and 1954 were prepared by an outside certified public accountant. Smith's and Eisele's efforts to reduce their responsibilities during Chemold's 1953 and 1954 fiscal years were unsuccessful. They found themselves still devoting a substantial amount of time to Chemold's business, with the additional burden of training the new employees, during the two years of Chemold's greatest production. (Adjusted gross sales in 1953 were $1,170,541.59 and in 1954 were $1,372,511.83 as compared to $499,939.12 in 1951, $344,639.68 in 1952, and $611,631.68 in 1955.) In 1950 the reinforced fiberglass industry was a new industry and the state of the art was very poor. Between 1951 and 1954 Chemold quickly became a leader in the industry and one of the very few profitable companies in the *168 fiberglass business. It had a reputation as a company that could produce a good product and "deliver the goods." In the fiberglass industry during Chemold's 1953 and 1954 fiscal years, the average number of executives employed in firms with annual sales over $800,000 ranged from five to eight. For the fiscal year ending August 31, 1953, Chemold had a total of 132 employees, exclusive of Smith and Eisele, of whom only five earned more than $4,800. For the fiscal year ending August 31, 1954, Chemold had a total of 131 employees, exclusive of Smith and Eisele, of whom only nine earned more than $4,800. During these years Chemold's business was operated by Smith and Eisele as substantially all of its executive staff. Smith and Eisele each received compensation for fiscal year 1953 in the total amount of $84,711.50 and for fiscal year 1954 in the total amount of $58,228.03. Eisele's total compensation was deducted on Chemold's corporation income tax returns, during the fiscal years in question, as part of its cost of production; Smith's was shown separately on the returns under Schedule E (Compensation of Officers). From the period commencing September 1, 1952, through its fiscal *169 year ending August 31, 1957, Chemold never declared any cash dividends and declared only one stock dividend, which was to Smith in Chemold's 1955 fiscal year. From September 11, 1950, through the end of Chemold's 1954 fiscal year, most of Chemold's income was derived from Government contracts or subcontracts for which the prime contract was a Government contract. The compensation paid Smith and Eisele during Chemold's August 31, 1953 and 1954, fiscal years was not unreasonable. Opinion Re Issue 1 The first issue for our consideration is whether amounts paid by Chemold to compensate Smith and Eisele in the fiscal years ending August 31, 1953 and 1954, were unreasonable. For its fiscal years ending August 31, 1953 and 1954, petitioner Chemold deducted $169,423 and $116,456.07, respectively, as total compensation for Smith and Eisele. The Commissioner, in his notice of deficiency dated June 12, 1961, disallowed these deductions as unreasonable in amount to the extent that they exceeded $72,000 in each year. Chemold contends that the compensation was paid pursuant to an arm's-length arrangement entered into long before the salaries and bonuses were paid and represented a condition *170 of Smith's and Eisele's for entering into employment with Chemold. Petitioner further contends that the compensation arrangement was entered into at a time when the success or failure of the business could not be predicted. Petitioner points out that Smith agreed to give up a growing accounting practice which promised to pay him more than his starting salary at Chemold and that Eisele, a successful and experienced businessman agreed to turn his time and energies away from other successful operating businesses to the extent that Chemold required it. Petitioner maintains that Chemold's success was due mainly to the joint efforts of Smith and Eisele. Finally, petitioner contends that, although it hired a number of management level employees in 1953 and 1954 in order to divest Smith and Eisele of some of their responsibilities, the results thereof were not satisfactory and that Smith and Eisele had to devote substantial time to the training of the new employees as well as the running of Chemold. Respondent contends that the compensation arrangement was the result of Smith's and Eisele's control over Chemold rather than the result of arm's-length bargaining; that neither Smith nor *171 Eisele had prior training or experience in the plastics business; that both performed far more duties for Chemold in the two years preceding the years in issue for far less compensation; and that the financial success of Chemold during the years in question was due far more to Korean War Government contracts and the services of other employees of Chemold than to the services of its two principal stockholder-officers, the recipients of the compensation in issue. Section 162(a)(1) [1] of the Internal Revenue Code of 1954 provides: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; [2]
Reasonableness of compensation is a question of fact. Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. The burden *172 of proving reasonableness is upon petitioner. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). We have found as an ultimate fact that Chemold has carried this burden of proof. In Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (C.A. 6, 1949), the Court, though recognizing that each case must stand on its facts, set forth certain basic factors to be considered in determining the reasonableness of salary, to wit: Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rate of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous *173 years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. * * * We have carefully considered the nature, extent and scope of the employee's work. There seems to be little doubt that Smith and Eisele each did the work of several executives during the years in question. We have also considered the size and complexity of the business and have found that Smith and Eisele directed a fairly large (well over one hundred employees and gross sales of over one million dollars in each of the years in question) and highly complex business with singular success. They started with the assets of a bankrupt company, whose manufacturing techniques were out of date, and became a leader in their field within several years. Though neither Smith nor Eisele had previous experience in the fiberglass industry, their managerial skills, general business acumen, and ability for hard work enabled Chemold to successfully compete in a highly competitive industry. Respondent makes much of the fact that Korean War Government contracts were responsible for most of Chemold's work and growth. While *174 the testimony as to the percentage of Chemold's Government work was contradictory, even were we to assume that substantially all of Chemold's production was under Government contracts (or subcontracts under Government contracts), we do not consider that meeting Government requirements refutes the proof presented by the petitioner. We do not believe that the Government demanded any lessor degree of excellence or economy in production than a private purchaser and certainly there was sufficient evidence as to the high degree of competition in the fiberglass industry during the period in question. We cannot accept respondent's contention that Smith's and Eisele's services were worth any less because their expertise and imagination took fruition in the production of a product for which the Government, rather than private citizens, was the customer. We have also carefully considered the evidence presented relating to the amount of time that Smith and Eisele devoted to Chemold during its 1953 and 1954 fiscal years. Their outside business activities required minimal amounts of time and effort during the years in question, and had no real bearing upon the successful direction and execution *175 of Chemold's affairs during its 1953 and 1954 fiscal years. Patterson v. McWane Cast Iron Pipe Company, 331 F. 2d 921 (C.A. 5, 1964). We have also compared Smith's and Eisele's compensation with Chemold's sales, income, invested capital, and dividends. When the decision as to compensation took place nobody knew whether Chemold would be a failure, a mild success or a great success. We consider that Chemold's success was due mainly to the efforts of Smith and Eisele. Their compensation grew in proportion to the success of their efforts. There is nothing in the applicable statutes or regulations declaring salaries paid on the basis of a bonus or profit-sharing plan unreasonable per se. In numerous cases, this Court and others have found salaries paid to officer-stockholders on the basis of profit-sharing bonus plans to be reasonable in amount. See e.g. Roth Office Equipment Co. v. Gallagher, 172 F. 2d 452 (C.A. 6, 1949). There are, of course, other criteria by which reasonableness of compensation can be measured. However, we have discussed only those which in our opinion are most pertinent to the facts of this case. On this record we conclude that the compensation *176 of Smith and Eisele was reasonable. To hold the petitioner accountable for a greater showing of substantiation would abuse the meaning and purpose of burden of proof. Cf. R. P. Farnsworth & Co. v. Commissioner, 203 F. 2d 490 (C.A. 5, 1953). Issues 2 and 3 Findings of Fact Sometime in 1953 Smith came in contact with one Jack E. Rust (hereinafter referred to as Rust) who was vice president and general manager of Spazier Soap & Chemical Company (hereinafter sometimes referred to as Spazier) whose business premises were next to Chemold's. Chemold needed some warehouse space and Spazier had space to rent. During the negotiations for the rental of warehouse space for Chemold, Rust learned that Smith was knowledgeable in tax, bankruptcy and business reorganization affairs. Rust came to Smith's office in late 1953 and advised him that Spazier was in serious financial trouble, was in arrears in the payments on several large notes, and was on the verge of bankruptcy. Rust asked Smith if he could help Spazier out of its difficulties. Smith began seriously to interject himself into the affairs of Spazier early in January 1954, at which time he learned that Rust and several *177 other Spazier shareholders had made themselves individually liable for some of Spazier's debts. Rust's personal guarantee of Spazier's debts amounted to about $40,000. Smith told Rust that he would be interested in helping Spazier only if all of the stock of Spazier could be obtained without cash. Rust brought several financial statements and the stockholder list of Spazier for Smith's examination. At this time Rust held 2,500 shares, Naylor (Spazier's chief chemist and president) had 2,500 shares, Morris Cohn (hereinafter sometimes referred to as Cohn) and his wife, Lillian, held 3,200 shares, one Verson had 400 shares and Saul Nadel held 400 shares of Spazier's capital stock. Rust assured Smith that all of the Spazier stock could be easily obtained since all of the shareholders were eager to get out of the failing corporation. He said that Cohn, the major stockholder, was particularly eager because he was a sick man, had lost interest in Spazier, had already gone through one personal bankruptcy, and was afraid to go through a second one. Several days later Rust arranged a meeting between Smith and Cohn at which time Cohn stressed that he was ill, wanted no part of a bankruptcy *178 and needed cash. It was at this meeting that Cohn announced that he had a second trust deed note, in the face amount of $132,000, on the Spazier property which he was willing to sell "cheap." The premises were owned by Nadco Building Corporation (hereinafter sometimes referred to as Nadco) whose stock was held 50-50 by Cohn and Saul Nadel. On the same day Smith looked at the Spazier property and discussed Cohn's proposition with Eisele, who agreed to purchase one-half of the second trust deed note if Smith bought the other half. The next day Smith and Cohn met. Cohn agreed to sell his second trust deed note, whose unpaid balance was $121,000, his stock in Spazier and a $50,952.67 note (with an unpaid balance of $50,919.27) of Spazier's for $25,000. Smith immediately had his secretary prepare an agreement (which also included Eisele as a purchaser) to this effect which Smith and Cohn signed. The agreement recited, in part, that: 1. Morris and Lillian Cohn agree to sell and Kenneth D. Smith and J. A. Eisele agree to buy for the sum of $25,000.00 the following: a. Trust deed dated… on the premises situated at 1619 20th Street, Santa Monica * * * b. 3200 shares of Capital Stock *179 of Spazier Soap and Chemical Company. c. Spazier Soap and Chemical Company notes payable in the amount of $50,919.27, plus accrued interest. d. Any and all other interests as they may appear which Morris and Lillian Cohn may have in and to Spazier Soap and Chemical Company. * * *
[Signed] Morris Cohn [Signed] Kenneth D. Smith Within approximately ten days of the above agreement, Rust learned that Cohn was trying to sell the Spazier premises which were owned by Nadco. Rust called Smith, advised him of what Cohn was doing and suggested that Smith might be interested in buying the premises. In the interim, Smith had acquired all of the Spazier stock, except 800 shares owned by the two minority shareholders, and held a meeting of Spazier's creditors which resulted in Smith's purchasing all of Spazier's debt for twelve cents on the dollar. On or shortly before January 29, 1954, Cohn offered, on behalf of Nadco, to sell the Spazier building and property to Smith for $160,000. Smith suggested to Eisele and the other directors that Chemold needed space and ought to buy the Spazier building. Smith told them that the purchase would involve very little cash since the purchase *180 price would include the assumption of the second trust deed note on which $121,000 was still outstanding, and the assumption of a $33,000 first trust deed note (held by the Bank of America) on which $26,230.59 was still outstanding. At this time Spazier was in default on its payments on the first trust deed and had paid neither interest nor principal on the second trust deed since July 28, 1952. The purchase of the Spazier building was negotiated by Smith, in his capacity as president of Chemold, and Cohn in his capacity as president of Nadco. To support his $160,000 asking price Cohn handed Smith a copy of an appraisal of the Spazier real property, which set forth that as of August 17, 1951, the total replacement value of the property was $167,047. A price of $150,000 was arrived at and Smith immediately had his secretary draw up an agreement of sale which was signed by Cohn as president of Nadco and Smith as president of Chemold. The agreement reads, in part, as follows: 1. Nadco Building Corporation agrees to sell, and Chemold Company agrees to buy for the sum of $150,000.00 those certain premises with the appurtenances situated at 1619 20th Street, Santa Monica, * * * 2. *181 This property shall be transferred through an escrow entered into with the Bank of America, Santa Monica, and seller will furnish a policy of title insurance in the amount of $54,000.00. 3. It is understood and agreed that buyer will assume all real estate taxes for the period July 1, 1953 to June 30, 1954. 4. Buyer and seller are to pay their own respective escrow fees. 5. It is understood and agreed that the $150,000.00 sales price includes the first mortgage due the Bank of America, in the approximate amount of $26,000.00 and a second trust deed to Morris and Lillian Cohn in the amount of $121,000.00. 6. This agreement is contingent upon the transfer of the second trust deed mentioned in Item 5 above from Morris and Lillian Cohn to Kenneth D. Smith and J. A. Eisele. 7. Seller agrees to transfer to buyer all right, title and interest which it may have in rental payments due and/or any other obligations of Spazier Soap and Chemical Company. 8. All insurance policies in effect on the subject property will be transferred to the buyer as part consideration of the transfer herein. [Emphasis supplied] At this time Smith added a handwritten sentence to the agreement to *182 purchase the second trust deed, similar to clause 6 of the above agreement between Nadco and Chemold, which stated that: This transfer is subject to completion of buy and sell agreement between Nadco Building Corporation and Chemhold Company as of this same date and placed his initials next to the sentence. Smith testified that these provisions were placed in the respective agreements because he had not yet been able to secure the signature of Lillian Cohn on the agreement for the purchase of the second trust deed and was afraid the whole "deal" would fall through. On January 29, 1954, Smith and Cohn went to the escrow department of the Bank of America, Santa Monica, California branch (hereinafter sometimes referred to as the Bank). They handed the escrow clerk the agreements and advised her of the terms of the agreements. They entered into Escrow #218-18589-H which provided for the purchase of the Spazier property by Chemold from Nadco. The escrow instructions provided, inter alia, for a total stated consideration of $150,000, consisting of Chemold's assumption of liability for the unpaid balances due under first and second mortgages on the Spazier property held by the Bank *183 and Morris and Lillian Cohn, respectively, in the approximate amounts of $26,000 and $121,000, and Chemold's payment of $3,000. Smith also had the escrow clerk include the following clause on the first page of the escrow agreement: It is understood and agreed the closing of this escrow is contingent upon the fulfillment of the terms of an Agreement between Morris and Lillian Cohn and Kenneth D. Smith and J. A. Eisele, a copy of which is handed in herewith and made a part of this escrow. At this time Smith also put into the escrow Chemold's check No. 5415 (signed by Smith) for $3,000. Between January 29 and February 16, 1954, Smith contacted Cohn several times in an effort to induce him to carry out the terms of both agreements but received no satisfaction except a statement that changes would have to be made. Cohn requested an increase of the sale price of the real property from $150,000 to $157,993.04 and offered to reduce his price to Smith and Eisele for the second trust deed, the Spazier stock and the Spazier note to $16,880 ( $140 of this amount was allocated to the Cohn stock), to which requests Smith acceded. Between February 16 and February 18, 1954, Smith caused to *184 be prepared the revised agreements covering the purchase of the second trust deed note, the agreement covering the transfer to him of the Spazier stock at five cents per share, and an agreement for transfer of the Spazier note for a consideration of $100. [3] On February 18, 1954, Smith and the Cohns met at escrow and the instructions of the escrow agreement were amended to provide, in part, that Chemold was to give total consideration in the amount of $157,993.04, consisting of cash in the amount of $11,000 and Chemold's assumption of liability in the amounts of $25,993.04 and $121,000 under the aforementioned first and second mortgages on the Spazier property. It was also at this time that Lillian Cohn executed the assignment on the reverse side of the second trust note, the assignment of the second trust deed form, the agreement relevant to the sale of shares of Spazier stock, the assignment "AGREEMENT" covering the trust deed, and the assignment of the Spazier note. At the time the parties were involved in the above-said escrow and amended escrow, interest, payable *185 semiannually at the rate of 5 percent on the second trust deed, was due and unpaid from July 28, 1952, in the amount of $12,604.17; the $11,000 principal payment was due from December 1, 1953. An excerpt from the Chemold corporate minute book reflects that at a meeting of its board of directors held on February 22, 1954, Smith and Eisele were authorized to purchase the real property from Nadco and to refinance the existing first mortgage thereon with the Bank by increasing the loan and first mortgage back to $33,000. By a subordination agreement dated February 19, 1954, Smith and Eisele agreed to subordinate their second trust deed note to the new loan of $33,000 by the Bank of Chemold, which was to be secured by a first trust deed against said real property. This subordination was required by the Bank as a prerequisite to the new loan. On or about March 2, 1954, both the deed by which Chemold acquired the Spazier property from Nadco and the assignment of the deed of trust to Smith and Eisele from the Cohns were recorded. Smith and Eisele paid Cohn and his wife $17,000, in consideration for the transfer to them of the second trust deed note and the assignment to Smith of the *186 Spazier stock and the Spazier promissory note, by a check dated March 5, 1954, drawn on Chemold's bank account. The disbursement was charged on the books and records of Chemold to "Accounts Payable Officers"; $8,500 of which was charged to the individual drawing account of Smith and the remaining $8,500 of which was charged to the individual drawing account of Eisele. As of March 5, 1954, prior to the issuance of the $17,000 check, the books and records of Chemold reflected an indebtedness to Smith in the sum of $58,717.32 and an indebtedness to Eisele in the sum of $63,559.41. At the close of the escrow, Chemold's check in the sum of $9,949.66, made payable to the Bank, was deposited with the escrowee to cover the balance of the purchase price due. With respect to the Spazier property, Chemold's books were adjusted to reflect that its cost basis of the property was $158,414.84, of which $33,150 was allocated to land and the balance of $125,264.84 to improvements. Thereafter, on August 31, 1954, Chemold accrued on its books $12,604.17 as interest payable on the second trust deed note from July 28, 1952, and $11,000 as principal due thereunder on December 1, 1953. One-half of the *187 total of these amounts, or $11,802.09, was credited by Chemold to the accounts payable of both Smith and Eisele on the same day. By bookkeeping entries, Chemold credited Smith with interest at five percent per annum (or $5,500 a year), for its 1955, 1956, and 1957 fiscal years, on the $110,000 unpaid balance of the second trust deed note. Theses sums were credited to his drawing account in each such year. The amounts of interest so credited to the account of Smith were included by Smith and his wife, as interest received, on their joint individual income tax returns in the respective years corresponding to such entries. In 1956 Chemold secured a loan of $40,000 and pledged the Spazier property as security. In either 1959 or 1960 Chemold secured a loan of $75,000 and pledged as security for the loan the Spazier property. In both instances Smith subordinated his second trust deed note [4] to the loans. Subsequent to Chemold's 1954 fiscal year, through its 1957 fiscal year, no principal payments were made on the second trust deed note. Eisele left Chemold *188 about December 15, 1954. At the time of his disassociation he forgave Chemold's indebtedness to him in the amount of $33,235.80, which amount included the interest from the second trust deed note Chemold had credited to this account. At that time he had received neither cash nor any other payment of interest or principal on the second trust deed note. He also relinquished all his rights in Chemold and the second trust deed in return for a cash settlement which included payment for his stock at the rate of $4 per share and Smith's personal note for $2,500 (which was paid several weeks later). [5] Eisele's stock was subsequently retired by Chemold. The acquisition by Smith and Eisele of the second trust deed note on the Spazier property and the acquisition of the Spazier property by Chemold were two separate transactions. Opinion Re Issues 2 and 3 The second issue *189 for our decision is whether Chemold's basis for depreciation of its Spazier property during its fiscal years ending August 31, 1954 through 1957, inclusive, is $36,465 as determined by respondent or $125,264.84 as claimed by Chemold. The third issue for our decision is whether Chemold is entitled to deduct amounts credited to the accounts of Smith and Eisele in the fiscal years August 31, 1954 through 1957, inclusive, as interest on the second trust deed note on the Spazier property. The parties have agreed as to the allocation of basis between the Spazier building and land so that only the total amount of depreciable basis available to Chemold is before us. The parties have further narrowed the second issue to the question of whether the acquisition of the second trust deed note by Smith and Eisele and the acquisition of the Spazier property by Chemold were in fact one transaction or two separate transactions. The parties have also agreed that if we find that there were in fact two transactions then Chemold would be entitled to its interest expense deduction in the years in question. At trial, respondent raised an alternative issue with regard to the $6,302.08 of interest credited *190 to Eisele's account in Chemold's 1954 fiscal year, to wit, that Eisele forgave this indebtedness during Chemold's 1955 fiscal year and such amount must be included as income on Chemold's return for such year. This issue being first raised orally at trial is not properly before us. Petitioner Chemold contends that the acquisition of the second trust deed note on the Spazier property and the acquisition of the Spazier property itself were two completely separate transactions. Respondent contends that the facts of record clearly show that the two acquisitions were, in reality, one transaction; that, if the chain of events that led up to the two acquisitions did begin as separate transactions, the two transactions became so completely merged with each other that they emerged as one; that Smith and Eisele never intended to acquire the second trust deed for themselves and merely adopted the form that they did for pure tax purposes; that Smith's training in, and knowledge of, the tax law strongly point towards its contention that there was no reality to the transactions. After careful consideration of all the evidence before us, we have found as an ultimate fact that there were two separate *191 transactions and thus sustain petitioner Chemold on issues 2 and 3. The parties have agreed that this factual finding is dispositive of issues 2 and 3. Issue 4 Findings of Fact The facts necessary to our determination of issue 4 are set forth under our Findings of Fact under issues 2 and 3 and are incorporated in this portion of our opinion by this reference. Opinion The fourth question presented for our decision is whether petitioner Smith realized additional income of $52,000 in calendar year 1954 as the result of personal services performed on behalf of Cohn. This issue is an alternative position that respondent requests us to consider if we find, as we have, that the acquisition of the second trust deed note on the Spazier property by Smith and Eisele and the acquisition of the Spazier property by Chemold were two separate transactions. Respondent contends that the facts contained in the record in this case prove that Smith acquired his one-half interest in the second trust deed note, with an unpaid balance of $121,000, for $8,500 after performing the valuable service of preventing the personal bankruptcy of Cohn. Respondent further contends that consequently, to the *192 extent that one-half of the $121,000 unpaid balance of the second trust deed note exceeds Smith's cost, that is, $60,500 less $8,500, such amount was compensation for services and taxable as additional income. Petitioner Smith contends that the bargain price he paid for the second trust deed note was the result of Cohn's serious financial straits, that he performed no services for Cohn, and that any benefits Cohn may have derived were only incidental to Smith's acting on his own behalf. We agree, upon consideration of all of the evidence before us, that Smith did not perform any services for Cohn which resulted in a reduction of the price for the second trust deed note. Smith was able to purchase at a low price because of Cohn's desperate need for cash. Consequently, we find Smith did not earn additional income in his 1954 taxable year for services performed for Cohn. Issue 5 Findings of Fact During its 1954 fiscal year, Chemold purchased a membership in the Bel-Air Country Club, in Smith's name, for $1,620. At the time of the purchase the club did not allow memberships to be held in the name of a business entity. At a meeting of Chemold's board of directors, held on December 14, 1953, the *193 matter of purchasing a membership in the Bel-Air Country Club on behalf of Chemold was discussed and a resolution to that effect was adopted. The minutes of the meeting contain the following references to the resolution: Mr. Smith advised that he had been invited to make application for membership in the Bel-Air Country Club and requested the Board to consider the advisability of such a move. It was pointed out that Chemold Company was embarking upon a program to reach a commercial market in patios and translucent panels and that the members of this club would be good contacts for marketing this material, as well as in many cases, good prospects themselves. It was also mentioned that the club was close enough to Chemold Company to permit lunches with customers and clients. After considerable discussion, it was RESOLVED: That Mr. Smith make application to the Bel-Air Country Club for membership and that the cost and expenses thereof would be paid by the Chemold Company. When the officers agreed to buy a membership in the name of Smith, it was agreed that as long as it was maintained for company business the corporation would pay the monthly expenses. They also agreed that if *194 and when the membership became of no further value to the company, if Smith chose to retain the membership for his personal use and pay the costs of maintenance, it would in effect be his personal membership. As of the date of trial the Bel-Air membership was still in Smith's name, Chemold was still paying the cost of maintaining it and, according to Smith, it was still being held for business purposes but was used very infrequently. Smith has never paid Chemold for the original membership fee. Smith's income tax returns for the calendar years 1954 through 1957 do not include the value of the membership as either additional compensation or as dividend income. Opinion The fifth issue presented for our consideration is whether Chemold is entitled to deduct the cost of a country club membership as a dues and subscription expense. Petitioner contends that the $1,620 payment to the Bel-Air Country Club represented an expenditure which was nonrecoupable under any circumstances, was the cost of acquiring a right which might have been used for only a few months, could not be capitalized on any basis and should properly be treated as a current business expense. Respondent contends *195 that the membership fee was not shown to have been a recurring expense or limited in usefulness to the year the expenditure was incurred. Respondent also contends that the membership will last as long as Chemold, through its president Smith, elects to remain a member and that consequently the cost of the membership was a capital expenditure. On this issue we sustain the respondent. The $1,620 membership payment was payable only once and had a useful life beyond the year of acquisition. Mercantile National Bank at Dallas, 30 T.C. 84 (1958), affd. on another ground, 276 F. 2d 58 (C.A. 5, 1960). The membership expenditure before us here is similar to the clearing house membership that was before us in Grace National Bank of New York, 15 T.C. 563 (1950), affd. per curiam, 189 F. 2d 966 (C.A. 2, 1951), where we said, with regard to the cost of the membership, at p. 565: It is not a recurring expense, and its benefits are not limited to the taxable year in which it was paid or incurred but will last as long as the petitioner elects to remain a member of the Association. It has utility long beyond the tax period involved. As such, it *196 is a capital expenditure rather than an "ordinary" business expense incurred during the taxable year. * * * Issue 6 Findings of Fact On November 8, 1955, Smith entered into a written lease with Pacific Electric Railway Company as lessor. The lease provided for the lease of land by Smith for a term of five years, commencing June 1, 1956, and ending May 31, 1961. The lease contained no option nor provision for extension or renewal except that any holding over would be on a month-to-month basis upon the same terms as provided in the five-year lease period. The policy of Pacific Electric Railway Company relative to its five-year leases is that at the end of the term of such a lease the lessee is allowed to hold over on a month-to-month basis so long as it is providing the company with adequate freight business. If the lessee does not produce sufficient freight revenues for the lessor, it is the policy of the lessor to find another tenant for the property, to terminate the lease, and to request that any improvements be removed if the new lessee does not agree to purchase them. Paragraph 14 of the lease, under which the lessor had a right to cancel the lease on 30-days' notice, *197 was deleted. It is also the policy of the lessor, if the property is needed for railroad purposes, to terminate the lease at the end of its term rather than allowing the lessee to continue on a month-to-month tenancy. During calendar year 1956, Smith expended $25,091.36 for construction of certain warehouse improvements on the leased property. In calendar year 1957, Smith expended an additional sum of $29,481.65 for construction of additional warehouse improvements. In 1956 Smith came to the conclusion that at the end of the five year term the lessor would terminate the lease. Smith based this conclusion on the following: (1) that the lessor had terminated a similar lease on an adjacent area, after the expiration of the fixed term therof; (2) the improvements which Smith had constructed on the leased property consisted of a warehouse which he intended to rent to third parties who might have railroad business needs and Smith was not in a position to control the amount of railroad traffic which his tenants would generate; (3) Smith had learned that the lessor had a policy of seeking lessees who were in a position to and did provide a maximum of freight income to the lessor; (4) in *198 1958, Smith leased a small parcel of adjoining land from the same lessor and the lessor terminated the lease at the end of the one-year term and leased it to a third person; (5) on one occasion, Smith sought the approval of the lessor to sublease the property but the lessor refused to grant approval and instead leased nearby property to Smith's prospective sublessee who then constructed its own building; (6) Smith knew that such a cancellation had occurred to a party who had leased from the railroad for 25 years. At the time of the trial, October 25, 1963, Smith was still in possession of the leased land under the holdover provisions of his lease and Pacific Electric Railway Company had no action pending against Smith relative to the cancellation of Smith's lease. Opinion The sixth and final issue for our consideration is whether Smith may amortize improvements he had erected on leased land over the five-year period of the lease rather than depreciate the improvements over their useful life. Smith contends that he had substantial reason to believe, at the time he made the improvements on the leased premises, that his five-year lease would not be renewed or extended any substantial *199 amount of time beyond the original five-year term. Smith also contends that the improvements were of such a nature that they had no salvage value because the cost of their removal would exceed any salvage value they had. Respondent, in support of his determination, contends that the provisions of the lease allows an indefinite term so long as Smith furnishes the lessor with business. As further support for his determination respondent cites the fact that Smith still held the land under the lease at the time of trial, some two and one-half years after the five-year term expired. Petitioner relies on section 1.162-11(b)(2), Income Tax Regs., which reads, in part, as follows: § 1.162-11 Rentals. * * *
(b) Improvements by lessee on lessor's property. * * * (2) If the lessee began improvements on leased property before July 28, 1958, or if the lessee was on such date and at all times thereafter under a binding legal obligation to make such improvements, the matter of spreading the cost of erecting buildings or making permanent improvements over the term of the original lease, together with the renewal period or periods depends upon the facts *200 in the particular case, including the presence or absence of an obligation of renewal and the relationship between the parties. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease, or the cost of improvements shall be spread only over the number of years the lease has to run without taking into account any right of renewal. * * * We have read the lease carefully and found that not only is there no obligation on the part of the lessor to renew but also that there is no provision for renewal of which Smith can take advantage. We cannot agree with respondent that the lease allows an indefinite term so long as Smith furnishes the lessor with business. Not only are the parties totally unrelated but we have the testimony of respondent's witness (an employee of the Pacific Electric Railway Company) that the policy of his employer is to find another tenant for any property which does not produce sufficient revenue. Consequently, we cannot be guided by the cases which have been decided on the basis of the close relationship between lessor and lessee. Respondent relies on Kerr-Cochran, Inc., 30 T.C. 69 (1958) *201 (acq. C.B. 1959-1, 4) which he contends is directly in point here. Kerr-Cochran also involved a railroad lessor, a five-year nonrenewable lease (the lease was renewable for 30-day periods), and a warehouse improvement. The taxpayer contended he was entitled to amortize the cost of the improvement over the term of the lease while the respondent contended that the taxpayer must depreciate the improvement over its useful life. The lease called for the taxpayer to pay the nominal rental of $56 a year and the warehouse was an integral part of the taxpayer's business for which there were apparently long-term plans. We said, at page 79: Even though the original lease was for 5 years, we think it was reasonably certain, from all of the evidence, that petitioner's tenancy was to continue for an indefinite period of time. As was stated in Standard Tube Co., 6 T.C. 950, 955, "where the tenancy of the lessee is for an indefinite period the allowance for exhaustion of the cost of improvements should be based upon the life of the improvements." [Emphasis supplied.] In this case we think it was reasonably certain, from all of the evidence, that Smith's tenancy was not to continue *202 indefinitely at the time he elected to amortize the cost of the warehouse he erected over the term of the five-year lease. Consequently, we hold for the petitioner on this issue. Decisions will be entered under Rule 50. Footnotes
1. All references are to sections of the Internal Revenue Code of 1954 unless otherwise designated.↩
2. Section 23(a)(1) of the 1939 Code, which applies to Chemold's pre-1954 Code years, is substantially the same as section 162(a)(1)↩.
3. It is not clear from the record, but apparently this $100 was also included in the $16,880 amount, supra.↩
4. When Eisele sold out all his interest in Chemold he also sold his half interest in the second trust deed note, infra.↩
5. There was no testimony as to the total amount paid Eisele and it is not clear as to whether Chemold or Smith made the cash payments to Eisele. It is also not clear what the $2,500 note was for except that it was the final payment for all of Eisele's interest in Chemold and several other joint ventures with Smith.↩